# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

JOEL IRWING WILSON,

　　　　　Defendant-Appellant.

UNPUBLISHED
July 25, 2017

No. 332124
Saginaw Circuit Court
LC No. 15-041205-FH

Before: SERVITTO, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions of one count of securities fraud, MCL 451.2501; one count of selling an unregistered security, MCL 451.2508; and one count of larceny by conversion of more than $1,000 but less than $20,000, MCL 750.362; MCL 750.356(3)(a). The trial court sentenced defendant, departing upward, to 80 months' to 10 years' imprisonment for each of the securities convictions and 30 months' to 5 years' imprisonment for the larceny conviction, all to be served concurrently. We affirm his convictions and sentence, but remand for correction of the scoring of the statutory sentencing guidelines.

## I. FACTS

In affirming defendant's convictions of similar charges in Bay Circuit Court,[1] we set forth the factual background to this case:

> Defendant's convictions arise from his involvement in an elaborate real estate scheme involving the purchase of distressed property to be renovated and sold at a profit. In 2009 defendant and his partner, Michael Kazee, started Diversified Group Management Partnership, LLC (Diversified) and American Realty Funds Corporation (American). Diversified, in turn, created 17 limited partnerships, each with a limited number of investors. Kazee left the company in May 2012. The prosecution alleged that defendant structured the various entities

---

[1] The charges in this case were originally part of the Bay Circuit Court proceedings. They were dismissed from the Bay Circuit Court case when defendant raised a venue challenge.

-1-

in a manner designed to evade compliance with federal and state securities laws and regulations, and to deceive individuals into investing in unprofitable companies, thereby allowing defendant to use the investment funds for his family's personal gain, rather than for the purposes for which the funds were invested. Over the course of this enterprise from 2009 to 2012, approximately 125 investors invested approximately $7 million. The investors lost approximately $6.4 million. The prosecutor maintained that, during this time period, defendant converted approximately $583,000 in Diversified assets. [*People v Wilson*, unpublished opinion per curiam of the Court of Appeals, issued August 23, 2016 (Docket No. 327375).]

In the case now before us, the securities convictions concerned the selling of "limited partnership" shares in Diversified to one investor, Vicki Tedrow. The larceny by conversion conviction stemmed from defendant purchasing a vehicle for his wife with investor funds.

II. ANALYSIS

A. SENTENCING

1. OFFENSE VARIABLES

Defendant first argues that the trial court incorrectly scored offense variables (OVs) 9, 10, and 14. "In an appeal claiming that the scoring of the sentencing guidelines was erroneous, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hutcheson*, 308 Mich App 10, 12-13; 865 NW2d 44 (2014). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "The interpretation of the statutory sentencing guidelines and the legal questions presented by application of the guidelines are subject to review de novo." *People v Underwood*, 278 Mich App 334, 337; 750 NW2d 612 (2008). "[T]he standards of review traditionally applied to the trial court's scoring of the variables remain viable after *Lockridge*.[2]" *People v Steanhouse*, 313 Mich App 1, 38; 880 NW2d 297 (2015).[3]

"Offense variable 9 is number of victims." MCL 777.39(1). A court should "[c]ount each person who was placed in danger of physical injury or loss of life or property as a victim." MCL 777.39(2)(a). Twenty five points are properly assessed when "20 or more victims . . . were placed in danger of property loss," MCL 777.39(1)(b), 10 points when "4 to 19 victims . . . were placed in danger of property loss," MCL 777.39(1)(c), and zero points when "fewer than 4 victims . . . were placed in danger of property loss," MCL 777.39(d).

---

[2] *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

[3] Leave to appeal granted 499 Mich 934 (2016).

At sentencing, defendant argued that OV 9 should be scored at zero points because he was only convicted of selling an unregistered security to Tedrow. The court concluded that 25 points was the correct score because "the situation here, involving these securities, was an ongoing activity, that did place a significant number of people in danger" of property loss. Defendant argues on appeal that OV 9 should have been scored at 10 points instead of 25 points.

"Offense variables must be scored giving consideration to the sentencing offense alone, unless otherwise provided in the particular variable." *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009). OV 9 is an offense-specific variable. *People v Sargent*, 481 Mich 346, 350; 750 NW2d 161 (2008). Thus, the sentencing court erred by looking beyond the sentencing offense to defendant's overarching criminal scheme of defrauding investors and selling unregistered securities. See *McGraw*, 484 Mich at 133 (explaining that it is erroneous to consider "the entire criminal transaction" when "scoring OV 9"). Because defendant's conduct during the sentencing offense only placed Tedrow in danger of losing property, OV 9 should have been scored at zero points. MCL 777.39(d).

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40(1). Ten points are scored where a defendant "exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status"; zero points are scored where the defendant "did not exploit a victim's vulnerability." MCL 777.40(1)(b), (d).

As used in this section:

\* \* \*

(b) "Exploit" means to manipulate a victim for selfish or unethical purposes.

(c) "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation.

(d) "Abuse of authority status" means a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher. [MCL 777.40(3).]

The trial court explained that assessing 10 points was justified "because the defendant did have a special status, comparable to a physician or teacher, because he had an expertise, and held himself out as having expertise in the area financial transactions or financial investments." Defendant argues that OV 10 should have been scored at zero points instead of 10 points because there was insufficient evidence to find that the victim was vulnerable in this case.

"[P]oints should be assessed under OV 10 only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *People v Cannon*, 481 Mich 152, 157-158; 749 NW2d 257 (2008). Courts should consider the following factors to consider when determining if the victim was vulnerable:

-3-

(1) the victim's physical disability, (2) the victim's mental disability, (3) the victim's youth or agedness, (4) the existence of a domestic relationship, (5) whether the offender abused his or her authority status, (6) whether the offender exploited a victim by his or her difference in size or strength or both, (7) whether the victim was intoxicated or under the influence of drugs, or (8) whether the victim was asleep or unconscious. [*Id.* at 158-159.]

The factors are not exhaustive, however, and a court may properly consider the unique circumstances of the case. *People v Hutson*, 489 Mich 451, 465-467; 802 NW2d 261 (2011).

Tedrow testified that she became involved with defendant through her niece, who was "an employee of the Diversified Group." Tedrow indicated that she learned through her niece about "the great things . . . that they were doing for the State or the cities." Tedrow testified that she invested the "funds that I had saved." And, when asked if "[i]t was your entire retirement account," Tedrow answered, "Everything." Additionally, it appears that Tedrow was not provided the full subscription agreement when she made her investments. Tedrow did not recall "seeing" the subscription agreements and indicated that she may have only been presented "the last pages." Even after investing with defendant, however, Tedrow was hired by and worked for defendant for a period of time.

While Tedrow may have been susceptible to defendant's persuasion, there is no evidence or indication that she met the definition of a "vulnerable person" for purposes of scoring OV 10. Therefore, OV 10 was incorrectly score at 10 points. It should have been scored at zero.

Next, defendant argues that OV 14 should have scored at zero points instead of 10. "Offense variable 14 is the offender's role." MCL 777.44(1). It presents two scoring alternatives: 10 points is properly assessed for OV 14 when "[t]he offender was a leader in a multiple offender situation," and zero points is appropriate when "[t]he offender was not a leader in a multiple offender situation," MCL 777.44(1)(a)-(b). "A 'multiple offender situation' is one in which more than one person—up to several or many persons—participates in a violation of the law." *People v Ackah-Essien*, 311 Mich App 13, 38; 874 NW2d 172 (2015). A leader "is a 'guiding or directing head' of a group." *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated in part on other grounds 494 Mich 880 (2013), quoting *Random House Webster's College Dictionary* (1997).

It appears the trial court considered defendant's overarching scheme of defrauding investors in determining that he was the leader in a multiple offender situation. Although the trial court should consider the "entire criminal transaction" when scoring OV 14, MCL 777.44(2)(a), we do not read that phrase as allowing the court to consider all criminal transactions in any way related to the sentencing offense. The trial court should have only considered the entire criminal transaction relating to Tedrow—that was the entire offense and criminal transaction for which defendant was being sentenced in this matter. Although there was testimony that defendant employed people to help market the limited partnerships, there was no evidence that anyone other than defendant was involved in selling securities to Tedrow. Therefore, OV 14 should have been scored at zero. MCL 777.44(1)(b).

With OVs 9, 10, and 14 rescored at zero points each, the recommended minimum sentence rage is reduced from 7 to 23 months to zero to 11 months. Remand for resentencing, however, on that basis is not necessary in this case as the trial court departed from the guidelines because it concluded that they did not adequately address the seriousness of defendant's actions. See *People v Mutchie*, 468 Mich 50, 52; 658 NW2d 154 (2003) (where the Supreme Court declined to review the scoring of OV 11 when "the circuit court clearly expressed its view that the [departure] sentences imposed in this case were the proper sentences without regard to how OV 11 might be scored").

Despite the fact that resentencing is not necessary, we remand for correction of defendant's guidelines score. *People v Melton*, 271 Mich App 590, 593, 596; 722 NW2d 698 (2006), superseded by statute on other grounds as stated in *People v Mann*, 287 Mich App 283, 285–86; 786 NW2d 876 (2010).

## 2. PROPORTIONALITY

Defendant argues that the imposed sentence was unreasonable. We review a departure sentence "for reasonableness under an abuse-of-discretion standard governed by whether the sentence fulfills the principle of proportionality . . . ." *People v Masroor*, 313 Mich App 358, 373; 880 NW2d 812 (2015)[4] (quotation marks and citation omitted). "A trial court abuses its discretion when it selects an outcome outside the range of reasonable and principled outcomes." *People v Uphaus (On Remand)*, 278 Mich App 174, 181; 748 NW2d 899 (2008).

"[T]he principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). "In making this assessment, the judge . . . must take into account the nature of the offense and the background of the offender." *Id*. at 651. " '[D]epartures [from the guidelines] are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing.' " *Steanhouse*, 313 Mich App at 45, quoting *Milbourn*, 435 Mich at 657 (second alteration by *Steanhouse*).[5] " '[T]rial judges may . . . depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime.' " *Id*., quoting *Milbourn*, 435 Mich at 657. " 'Even where some departure appears to be

---

[4] Leave to appeal granted sub nom *People v Steanhouse*, 499 Mich 934; 879 NW2d 252 (2016).

[5] Similarly, MCL 769.34(3)(b) provides that

> [t]he court shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight.

appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality.' " *Id.* at 46, quoting *Milbourn*, 435 Mich at 659-660. Factors a sentencing court may consider include:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation[.] [*Id.* (citations omitted).]

Defendant suggests that the fact that his business was actually operating is a mitigating factor that should have been considered. "This was not a case where Mr. Wilson was moving money to some out-of-country account or living in a mansion at investor's expense," he argues. But, Ann Tushaus, an accountant for the United States Securities and Exchange Commission, testified that approximately $582,000 of investor money was used to pay for "expenses benefitting [defendant] and the Diversified Group co-owner," including "payments directly to [defendant] of about 99,000," "payments to [defendant's] wife's entities," and "the purchase of Wilson's residence on Atlanta."

In any event, defendant's convictions were not based on how he ran the underlying business. His convictions are based on the misleading statements and omissions he made while selling unregistered securities. See *Milbourn*, 435 Mich at 651 (directing that a sentencing court "must take into account the nature of the offense"). There was testimony that American "never reported a profit" and "always operated a net loss." Yet defendant sold limited partnerships to Tedrow in February 2012 without mentioning American's struggles. And, although Tedrow did not receive a verbal guarantee from defendant on a rate of return for her investment, she was apparently under the belief she would receive rate of return consistent with that advertised by Diversified. The trial court found that a Diversified promotional video "refers to annual return to investors of 10 cents on the dollar." An accountant for the United States Securities and Exchange Commission testified that statements provided to Diversified investors "showed investor returns of approximately 10.44 annualized returns for all of the LP investors," but that the statements did not "match the reality of what was taking place truly with Diversified funds?"[6] In all, defendant raised "about 6.1 million" through the limited partnerships. It appears that at least some of defendant's investors were elderly persons who essentially lost their life savings.

Defendant asserts that the factors relied on by the trial court in imposing sentence were already accounted for by the guidelines, but he fails to present any argument in support, thereby abandoning the claim on appeal. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant . . . to assert an error and then leave it up to this Court to discover and rationalize the basis for his claims . . . .").

---

[6] Three other investors testified defendant told them that they would receive a rate of return on their investment of nine or 10 percent.

In any event, as the trial court reasoned, the guidelines do not reflect the devastating effect that defendant's actions had on the complainant. "The Legislature adopted the guidelines to promote uniform sentencing across the state." *People v Smith*, 482 Mich 292, 312; 754 NW2d 284 (2008). Consistent with the goal of uniformity is the principle of proportionality. Cf. *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003) (noting that in enacting the statutory guidelines, "[t]he Legislature has subscribed to this principle of proportionality in establishing the statutory sentencing guidelines"). Uniformity means that the guidelines are designed to apply to the average defendant under certain enumerated circumstances (prior record variables) and the severity of the crime committed under certain enumerated circumstances (offense variables).

The court here correctly concluded that the guidelines did not adequately account for the circumstances of this particular defendant and this particular crime. Tedrow indicated that she lost all of the roughly $250,000 in retirement funds she invested with defendant. Defendant was assessed 10 points under OV 16 for damage to property of more than $20,000. MCL 777.46(1)(b). A loss of $250,000 exceeds the floor set forth in § 6(1)(b) by such a degree of magnitude that the score of 10 points fails to account for the impact the crime had on Tedrow and the extent of the financial injury.

Considering the circumstances of this defendant and this sentencing offense, *Steanhouse*, 313 Mich App at 46, the trial court's departure sentence is within the range of principled outcomes.

## B. RULE OF SPECIALTY

Defendant was extradited from Germany to Michigan to face trial in Bay Circuit Court. Some of the charged offenses were refiled in Saginaw Circuit Court after defendant raised a venue challenge. Defendant argues on appeal that the refiling of charges in a different venue violates Article 22 ("Rule of Speciality"[7]) of the Treaty on Extradition Between the United States of America and the Federal Republic of Germany (signed June 20, 1978).[8] We review this question of law de novo. *People v Henry*, 315 Mich App 130, 143; 889 NW2d 1 (2016).

Article 22 provides in pertinent part as follows:

---

[7] "The phrases 'doctrine of specialty' and 'doctrine of speciality' are used interchangeably[.]" *United States v Lomeli*, 596 F3d 496, 500 n 2 (CA 8, 2010).

[8] Below, defendant moved to dismiss the charges on the basis that the Rule of Specialty was violated. He argued he "was not extradited from Germany to face charges in Saginaw County. The extradition was granted only as to the charges that were filed and then pending in Bay County." The prosecution responded that "[p]rior to trial Defendant asserted his venue defense to the substantive Saginaw offenses. The People dismissed those counts and filed them here." The trial court denied defendant's motion after determining that "there was no change in the offense" and that "changing the venue from Bay County to Saginaw County" did not violate the treaty.

(1)  A who person has been extradited under this Treaty shall not be proceeded against, sentenced or detained with a view to carrying out a sentence or detention order for any offense committed prior to his surrender other than that for which he was extradited, nor shall he be for any other reason restricted in his personal freedom, except in the following cases:

(a)  When the State which extradited him consents thereto. . . .

(b)  When such person, having had the opportunity to leave the territory of the State to which he has been surrendered, has not done so within 45 days of his final discharge or has returned to that territory after leaving it. . . .

* * *

(3)  If the offense for which the person sought was extradited is legally altered in the course of proceedings, he shall be prosecuted or sentenced provided the offense under its legal description is:

(a)  Based on the same set of facts contained in the extradition request and its supporting documents; and

(b)  Punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.

"The Rule of Specialty, a treaty-law doctrine, holds that a nation seeking return of a person under the terms of an extradition treaty may prosecute the extradited person only to the extent expressly authorized by the surrendering nation in the grant of extradition." *United States v Stokes*, 726 F3d 880, 887-888 (CA 7, 2013).  Accordingly, the rule " 'requires that the requesting country not prosecute for crimes . . . for which an extradition was not granted.' " *United States v Garrido-Santana*, 360 F3d 565, 577 (CA 6, 2004), quoting *Demjanjuk v Petrovsky*, 776 F2d 571, 583 (CA 6, 1985).

"The doctrine of specialty is designed to prevent prosecution for an offense for which the person would not have been extradited or to prevent punishment in excess of what the requested state had reason to believe was contemplated." Restatement (Third) of Foreign Relations Law of the United States, § 477, comment *b*, p 579.  "What the doctrine of specialty requires is that the prosecution be 'based on the same facts as those set forth in the request for extradition.' " *United States v Sensi*, 879 F2d 888, 895 (DDC, 1989), quoting Restatement, § 477, comment *a*, p 579.

[T]he inquiry into specialty boils down to whether, under the totality of the circumstances, the court in the requesting state reasonably believes that prosecuting the defendant on particular charges contradicts the surrendering state's manifested intentions, or, phrased another way, whether the surrendering state would deem the conduct for which the requesting state actually prosecutes the defendant as interconnected with (as opposed to independent from) the acts for which he was extradited.  [*United States v Saccoccia*, 58 F3d 754, 767 (CA 1, 1995).]

Defendant does not assert that additional charges were brought against him or that the offenses for which he was extradited substantively changed. Rather, he argues that the change of venue and amendment as to the complaining witnesses amounted to "a substantial change that results in the broadening of the charges." Defendant presents no authority supporting his claim that a change of venue violates the rule. See *Mitcham*, 355 Mich at 203 ("It is not enough for an appellant in his brief simply to announce a position" and leave it up to the appellate court to "search for authority either to sustain or reject his position."). Regardless, an intra-state change in venue for three of the offenses for which defendant was extradited does not offend the rule's goal of preventing an extradited defendant from being charged or punished in a way unanticipated by the state granting extradition. See Restatement, § 477, comment *b*, p 579.

As for the complaining witnesses, defendant asserts that he "was extradited from Germany under a complaint that alleged that the victims or complaining witnesses against her (sic) were Robert Wachowski, Vicki Brandel [a/k/a Tedrow], and David Charlesbois in Bay County, Michigan." He argues that when plaintiff realized it "could not prove [he] committed . . . a crime against Mr. Wachoski," plaintiff "amended the complaint changing Mr. Wachoski to Ms. Buehl, who never testified in this case . . . ." Although the original complaint filed in Saginaw County District Court alleged crimes against Wachowski, Buehl, Tedrow, and Charlesbois, that charge was voluntarily dismissed. Further, the information was ultimately amended to contain only allegations pertaining to Tedrow. Thus, defendant does not establish the factual predicate to his argument — he was not prosecuted for conduct relating to Buehl.

In sum, the prosecution of three of the extradited offenses in a different venue did not violate Article 22. No additional offenses were brought against defendant and he was not prosecuted for crimes against an unforeseen complainant.[9]

## C. GREAT WEIGHT OF THE EVIDENCE

Finally, defendant argues that the verdict was against the great weight of the evidence. We review a "great-weight issue by deciding whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Cameron*, 291 Mich App 599, 616- 617; 806 NW2d 371 (2011) (quotation marks and citation omitted). Findings of fact made by a court in a bench trial "may not be set aside unless they are clearly erroneous." *People v Lanzo Constr Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998).

---

[9] Because the trial court correctly ruled that the Rule of Specialty was not violated, defendant's assertion that the trial court erred in concluding he did not have standing to raise the issue will not be discussed. See *B P 7*, 231 Mich App 356, 359; 586 NW2d 117 (1998) (mootness).

As part of his argument, defendant raises a general attack on the credibility of the investors and an expert witness who had been involved in a civil action brought against defendant. The trial court "found the testimony of all the witnesses, in this case, to be credible." "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). Defendant does not explain how any of the testimony was conflicting, impeached, or implausible and thus there is no ground to deviate from the general rule that issues of credibility are for the trier of fact. See *Lemmon*, 456 Mich at 643-647.

## 1. SECURITIES FRAUD

Section 508(1) of Michigan's Uniform Securities Act ("Securities Act"), MCL 451.2101 *et seq.*, provides:

> A person that willfully violates this act or a rule adopted or order issued under this act, except section 504 or the notice filing requirements of section 302 or 405, or that willfully violates section 505 knowing the statement made to be false or misleading in a material respect, is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $500,000.00 for each violation, or both. . . .[MCL 451.2508]

Section 501(b) provides in part as follows:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security . . . to directly or indirectly do any of the following:
>
> * * *
>
> (b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

"A material fact is one that a reasonable investor might have considered important to his investment decision." *People v Cook*, 89 Mich App 72, 83; 279 NW2d 579 (1979).

Defendant argues that his securities fraud conviction is based on the theory that he guaranteed a rate of return to investors and failed to disclose that they could lose all of their investment. There is no indication that the trial court convicted defendant on this charge for representing a specific rate of return to Tedrow. However, the court did find that defendant had failed to disclose material facts to investors. Specifically, the trial court found that "statements were made in the course of the . . . sale or purchase of a security" and that defendant "made an untrue statement of a material fact or omitted to state a material fact necessary to make the statement not false or misleading," without specifying the statement or omission.

There was sufficient evidence to convict defendant for securities fraud for his failure to disclose American's struggling financial condition. It appears the subscription agreements contain disclosures regarding Diversified's relationship with American and the possibility that

investor funds may be loaned to American. Assuming that Tedrow received the full subscription agreements and that those agreements contained such disclosures, she testified nonetheless that defendant did not tell her "that American Realty had never generated a profit and was in difficulty of going out of business." That Diversified was loaning money to an entity that had, according to Tushaus, "never reported net income" and "ceased making interest payments" to Diversified on its on loans were material facts because "a reasonable investor might have considered [them] important to [her] investment decision." *Cook*, 89 Mich App at 83.

Further, Tedrow testified that defendant also failed to disclose that he would be using investors' funds for his personal use, which was also a fact that a reasonable investor could have considered important.

## 2. UNREGISTERED SECURITIES

Section 301 of the Securities Act provides as follows:

A person shall not offer or sell a security in this state unless 1 or more of the following are met:

(a) The security is a federal covered security.

(b) The security, transaction, or offer is exempted from registration under [MCL 451.2201 to 451.2203].

(c) The security is registered under this act.

The pertinent exemption is this case, MCL 451.2202, provides as follows:

(1) The following transactions are exempt from the requirements of [MCL 451.2301 to 451.2306 and MCL 451.2504]:

* * *

(n) A sale or an offer to sell securities by or on behalf of an issuer, if the transaction is part of a single issue in which all of the following are met:

(*i*) There are not more than 50 purchasers in this state during any 12 consecutive months, other than those designated in subdivision (m).[10]

(*ii*) There is no general solicitation or general advertising used in connection with the offer to sell or sale of the securities.

---

[10] "An institutional investor," "A federal covered investment adviser," and "Any other person exempted by rule or order under this act." MCL 451.2202(m).

(*iii*) A commission or other remuneration is not paid or given, directly or indirectly, to a person other than a broker-dealer registered under this act or an agent registered under this act for soliciting a prospective purchaser in this state.

(*iv*) The issuer reasonably believes that all the purchasers in this state other than those designated in subdivision (m) are purchasing for investment. [MCL 451.2202(1)(n)(*i*)-(*iv*).[11]]

"In a criminal proceeding under [the Securities Act], a person claiming an exemption, exception, preemption, or exclusion has the burden of going forward with evidence of the claim." MCL 451.2503. Our Supreme Court interpreted a provision similar to § 503 in the former act[12]

to mean that once the state establishes a prima facie case of statutory violation, the burden of going forward, *i.e.*, of injecting some competent evidence of the exempt status of the securities, shifts to the defendant. However, once the defendant properly injects the issue, the state is obliged to establish the contrary beyond a reasonable doubt. [*People v Dempster*, 396 Mich 700, 713-714; 242 NW2d 381 (1976).]

Defendant did not dispute that the limited partnerships were securities, and a certificate from the Michigan Department of Licensing and Regulatory Affairs and the SEC established that the partnerships were not registered. Tedrow's testimony established that she purchased a limited partnership from defendant. Accordingly, defendant's conviction of selling unregistered securities was not against the great weight of evidence.

Defendant, referring to the advertising component of the aforementioned statutory exemption, argues "[t]here was no evidence that any of the limited partnerships were ever advertised." But defendant bore the burden of presenting evidence that an exemption applied, MCL 451.2503, which he did not do.

### 3. LARCENY

The elements of larceny by conversion are:

---

[11] Defendant also indicates that MCL 451.2202(k) provided a possible exemption. But that exemption applies to "[a] transaction in a note, bond, debenture, or other evidence of indebtedness secured by a mortgage or other security agreement," MCL 451.2202(k), and is therefore not applicable to present circumstances.

[12] MCL 451.802(d) provided that "[i]n any proceeding under this act, the burden of proving an exemption or an exception is upon the person claiming it." *People v Dempster*, 396 Mich 700, 711; 242 NW2d 381 (1976) (quotation marks omitted).

(1) the property at issue must have some value, (2) the property belonged to someone other than the defendant, (3) someone delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means, (4) the defendant embezzled, converted to his own use, or hid the property with the intent to embezzle or fraudulently use it, and (5) at the time the property was embezzled, converted, or hidden, the defendant intended to defraud or cheat the owner permanently of that property. . . . [*People v Mason*, 247 Mich App 64, 72; 634 NW2d 382 (2001) (quotation marks and citation footnotes omitted).[13]]

"Stated more simply, larceny by conversion occurs 'where a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to his own use.' " *Id*., quoting *People v Christenson*, 412 Mich 81, 86; 312 NW2d 618 (1981).

Defendant focuses on his purchase of a vehicle from Saginaw Valley Ford Lincoln. Sonya Terry testified that defendant "came in looking for a vehicle, selected one, and purchased it." She stated the purchase was paid for by a "company check," which was admitted into evidence. Defendant does not dispute the trial court's finding that investor funds were used to purchase the vehicle. Rather, he argues that it was not established the vehicle was not a company car.

All the evidence suggested that the car was purchased for and used by defendant's wife. Terry agreed that defendant's wife was listed "on the title as the owner . . . and [defendant] is referred to as the co-owner." She testified that defendant's wife arrived to pick up the vehicle after the sale. Peter Ackerly, an investigator with the Attorney General's Office, testified he saw the vehicle twice and "there was no Diversified advertising on it . . . ." It appeared to him the vehicle was being used for "personal reasons." This evidence reasonably supports a finding that defendant converted the funds for his own use. *Lacalamita*, 286 Mich App at 469.

---

[13] MCL 750.362 states as follows:

Any person to whom any money, goods or other property, which may be the subject of larceny, shall have been delivered, who shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money or other property, or any part thereof, shall be deemed by so doing to have committed the crime of larceny and shall be punished as provided in the first section of this chapter.

MCL 750.356(3)(a) sets forth the maximum punishment for larceny when "[t]he property stolen has a value of $1,000.00 or more but less than $20,000.00."

Defendant's convictions and sentences are affirmed.  We remand for correction of the scoring of the sentencing guidelines consistent with this opinion.  We do not retain jurisdiction.

/s/ Deborah A. Servitto
/s/ Christopher M. Murray
/s/ Stephen L. Borrello